UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

JOSEPH K. SOUTHWORTH,

Plaintiff,

v.

JO ANNE B. BARNHART, Commissioner of the
Social Security Administration,

Defendant.

Civil No.    06-CV-0699 BEN (CAB)

**ORDER DENYING PLAINTIFF'S
MOTION FOR SUMMARY JUDGMENT
AND GRANTING DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT**

**[Doc. ## 8, 10]**

## I.  INTRODUCTION

Plaintiff Joseph K. Southworth ("Plaintiff" or "Southworth") applied for Disability Insurance
Benefits and Supplemental Security Income Disability Benefits alleging a disability beginning on
February 1, 2001.  (Tr. 68-70).[1]  Following an administrative hearing on December 9, 2004, an
Administrative Law Judge ("ALJ") issued a written decision dated January 27, 2005.  (Tr. 14-29).  The
ALJ found that Plaintiff was not disabled.  (Tr. 29).  On February 1, 2006, the Appeals Council denied
review.  (Tr. 6-9).  The ALJ's decision became the final decision of the Commissioner of Social
Security.  Plaintiff brought the present judicial action.

Plaintiff filed a motion for summary judgment.  [Doc. # 8].  Defendant Jo Anne B. Barnhart filed
an opposition and a cross-motion for summary judgment.  [Doc. # 10].  For the reasons that follow,

---

[1]All references to the evidence are references to the page numbers in the Administrative Record
filed with Defendant's Answer.  [Doc. # 5].

1   Plaintiff's motion is **DENIED,** and Defendant's motion is **GRANTED.**

## II. FACTS

Plaintiff was born in 1961 and has a graduate equivalency diploma. (Tr. 68, 87, 421). He has past work experience as a journeyman plumber. (Tr. 82). Southworth's disability arises out of an industrial accident on February 9, 2000. (Tr. 422). Plaintiff was hit in the chest with a lift basket and thrown against a wall. (Tr. 144). The disability is alleged due to back pain, headaches, myoclonic tremors, dizziness, and mood disorders.

### A.    Medical History

Stanley M. Besser, M.D. ("Dr. Besser") saw Plaintiff from February 9, 2000, until April 14, 2000, for complaints of neck pain. On February 9, 2000, Plaintiff showed normal range of motion of his neck. (Tr. 19). On February 11, 2000, Plaintiff displayed normal neck and back curvature. *Id.* Physical examination revealed no lumbar spasms or trigger points. *Id.* Straight leg test was normal in the sitting position. The gait was also normal. *Id.* On February 11, 2000, Dr. Besser released Plaintiff to work with the limitations of no repetitive climbing, stooping, or bending; no overhead reaching or lifting; and no lifting of over 10 pounds. *Id.*

On February 13, 2000, Plaintiff sought treatment at Kaiser Permanente. (Tr. 144-45). Plaintiff complained of neck pain, shakiness, and numb hands. Clinical examination showed cervical tenderness and moderate tenderness in the paraspinous muscles at the base of the occiput. (Tr. 144). Neurological exam showed tonic/clonic/myoclonic jerking movements of both arms and legs. (Tr. 145). Plaintiff was given an intravenous treatment of Benadryl, and his tremors stopped. (Tr. 19).

While in the hospital, Plaintiff tested positive for cocaine, amphetamines, and opiates. (Tr. 137-43, 145). Plaintiff denied using recreational drugs. Southworth attributed the opiates to the codeine in his pain medication. Later, at the administrative hearing, Plaintiff testified that a subsequent test revealed that the presence of cocaine was a false positive, and that the presence of amphetamines was due to his over-the-counter allergy medication. (Tr. 446).

On October 17, 2000, Plaintiff saw Bruce Lasker, M.D. ("Dr. Lasker"), a neurologist. Southworth complained of back pain and spasms in his arms and legs. (Tr. 236). The pain was made worse by such activities as bending and lifting. *Id.* Dr. Lasker noted that Plaintiff's arms and legs were

06cv0699

1   shaking.  The shaking was rhythmic at times and slightly dysrhythmic at times.  (Tr. 237).  Southworth

2   displayed "jerking" activity, sometimes with percussion.  The jerking varied from general to the jerking

3   of the trunk or a limb.  *Id*.  Plaintiff's father had noticed the jerking and shaking even when Plaintiff was

4   asleep.  (Tr. 236).  Dr. Lasker noted that the movements could be myoclonic, but that they looked non-

5   physiological because they were combined with the shaking.  (Tr. 238-39).

6          Dr. Lasker found normal bulk, strength and reflexes, except that knee reflexes were slightly more

7   active.  Plaintiff's gait was normal, and he could heel and toe walk.  (Tr. 238).  The sensory exam was

8   normal.  *Id*.  Dr. Lasker concluded that the movement disorders were not caused by a dysfunction of the

9   brain, nerves, or spinal cord.  *Id*.  Dr. Lasker noted that Plaintiff's problems were "quite disabling" both

10  socially and psychologically, and needed treatment.  (Tr. 239).

11         On November 15, 2000, Dr. Lasker saw Plaintiff after another episode of shaking and spasms.

12  (Tr. 231).  Plaintiff's father was also present and confirmed that the movements occurred during

13  Plaintiff's sleep.  Dr. Lasker opined that it was less likely for the movements to be related to

14  malingering and more likely to be related to anxiety.  (Tr. 233).  The physician also opined that the

15  movement disorder would make it difficult for Plaintiff to work.  *Id*.

16         On December 14, 2000, at the behest of the workers' compensation insurer in connection with a

17  workers' compensation claim, Plaintiff was examined by Robert Warren, M.D. ("Dr. Warren"), a

18  neurologist and qualified medical examiner.  (Tr. 161-76, 168-69).  Plaintiff complained of neck pain,

19  lower back pain, "excessive sensitivity" in his lower extremities, and periods or tremulousness since his

20  injury in February 2000.  (Tr. 168-69).  Physical examination revealed no musculoskeletal deformity

21  and showed full flexion, extension, and lateral bending of the neck.  (Tr. 170-71).  No lumbar

22  examination appears to have been performed.  Plaintiff's mental state was noted to be "normal," with no

23  language or memory disorder.  (Tr. 171).  Cranial nerve examination revealed no abnormalities.  *Id*.

24  Motor evaluation revealed "jumpiness," with his leg "moving up and down in a very rhythmic fashion,

25  sometimes accompanied by his arm, sometimes accompanied by the opposite side of the body."  The

26  movement "completely stopped" when Plaintiff performed actions requiring coordination and strength.

27  *Id*.  A cervical MRI taken on December 18, 2000, showed a broad-based disc protrusion mildly

28  impressing the ventral sac at C3-4, and disc degeneration and spondylosis with mild impingement on the

1    ventral sac at C5-6 and C6-7.  (Tr. 157-58).  Dr. Warren diagnosed Plaintiff with lumbar degenerative

2    disease, aggravated by his injury; chest wall contusion; degenerative cervical spine disease, also

3    aggravated by his injury; and a tremor "of uncertain etiology."  (Tr. 174-75).

4           On January 23, 2001, Plaintiff saw Dr. Warren again.  Plaintiff reported lower back and leg pain,

5    with occasional neck pain.  (Tr. 19).  Dr. Warren diagnosed Plaintiff with degenerative disc disease of

6    the lumbar and cervical spine, and precluded him from "very heavy work" and "very heavy lifting."  Dr.

7    Warren concluded that Plaintiff's capacity for lifting, bending, stooping, pushing, pulling and climbing

8    was reduced by 25%.  (Tr. 20).

9           On January 25, 2001, Dr. Lasker reviewed Dr. Warren's records and opined that Southworth

10   would be precluded from work that involved lifting or carrying over 10 pounds, repetitive bending or

11   stooping, or activities involving flexion or extension of his back.  (Tr. 229).

12          In a report dated February 21, 2001, Dr. Lasker listed diagnoses of cervical and lumbar sprain;

13   cervicogenic headaches, stress-related spasms, a resolved chest wall contusion, and degenerative disease

14   of the lumbar and cervical spines.  The degenerative disease was found to be unrelated to Plaintiff's job.

15   (Tr. 225).  Dr. Lasker concluded that Southworth lost 25% of his work capacity for bending, stooping,

16   lifting, pushing, pulling and climbing, and should be restricted to "no heavy work."  (Tr. 226).  In a later

17   report, dated March 2, 2001, Dr. Lasker changed this recommendation to "no very heavy work" and "no

18   very heavy lifting."  (Tr. 222).  In the February 21, 2001 report, Dr. Lasker also found that Southworth

19   could not engage in an occupation which requires sitting for more than 60 minutes at a time without

20   taking a break for at least one minute to stretch.  (Tr. 226).  Dr. Lasker noted that no benefit had been

21   received from chiropractic care or physical therapy, and that this condition was permanent and

22   stationary.  (Tr. 225).

23          On March 22, 2001, Plaintiff was feeling worse and still in pain.  (Tr. 220).  The back pain and

24   spasms were occurring more with sitting than standing, and he felt best when lying down.  (Tr. 22).  Dr.

25   Lasker reiterated his February 21, 2001 diagnoses, and recommended physical therapy.  (Tr. 220-21).

26   On April 19, 2001, Plaintiff's back was doing better, especially with the recommended stretching

27   exercises.  (Tr. 218).  There were still problems with bending and lifting.  *Id*.

28           In November 2002, Southworth indicated that he was depressed.  The vocational rehabilitation

06cv0699

1   college he attended had gone bankrupt.  (Tr. 211).  On January 30, 2003, Plaintiff experienced severe

2   back pain and some neck pain.  (Tr. 209).  There was a trigger point in the left trapezius area during the

3   exam, and a lot of tenderness in the lumbar spine.  *Id*.  Southworth could not sit down, his legs were

4   shaking during walking, and his gait was antalgic.  *Id*.  On February 20, 2003, Dr. Lasker noted that

5   despite the treatment he had given Mr. Southworth, the latter would be disabled for the next year.  (Tr.

6   208).

7           In May 2003, Southworth was taken to the emergency room because he felt dizzy, felt his hand

8   and leg twitch, and thought he might pass out.  Dr. Lasker was consulted and opined that Plaintiff had

9   functional tremors, which were likely psychogenic in origin.  (Tr. 225-57).

10          On December 27, 2002, Plaintiff was evaluated by Mounir Soliman, M.D. ("Dr. Soliman"), a

11  neurologist and psychiatrist.  (Tr. 179-82).  Plaintiff complained of "depression from [his] back pain."

12  (Tr. 179).  He was experiencing sadness, decreased energy, decreased concentration, and feelings of

13  hopelessness and helplessness.  (Tr. 180).  Positive findings on mental status examination consisted of

14  soft speech at a decreased rate and rhythm; recall of only three of five objects after five minutes; a

15  depressed mood; and neurovegetative signs of decreased energy and concentration.  (Tr. 181).  Dr.

16  Soliman diagnosed a mood disorder due to general medical condition and assessed Plaintiff's Global

17  Assessment Functioning ("GAF") at 68.  (Tr. 182).  A GAF score represents the individual's overall

18  level of psychological functioning.  American Psychiatric Ass'n, *Diagnostic & Statistical Manual of*

19  *Mental Disorders*, 32 (4th Ed. 1994).  A GAF score is based on a numerical rating ranging from 0 to

20  100, with the lower numbers representing more severe mental limitations.  *Id*. at 30-32.  A rating of 70

21  indicates mild symptoms, and a rating of 61 indicates "generally functioning pretty well."  *Id*. at 32.  Dr.

22  Soliman found no mental functional limitations and found Plaintiff able to understand, remember and

23  carry out both simple and complex instructions; to interact with others; and to withstand the stress and

24  pressures associated with an eight-hour day.  (Tr. 182).

25          In July 2003, Southworth started seeing Denise Parnell, M.D. ("Dr. Parnell"), an internist, for his

26  continued neck pain and tremors.  (Tr. 280-81).  In a Multiple Impairments Questionnaire dated

27  November 7, 2003, Dr. Parnell affirmed the diagnoses of cervical and lumbar spine degenerative disc

28  disease and chronic tremors.  (Tr. 266-73).  She reported that Plaintiff's symptoms and functional

06cv0699

1   limitations were not reasonably consistent with his physical impairments, and the tremors were

2   unexplained, with unclear etiology. (Tr. 21, 267). Neurologically Plaintiff was intact. (Tr. 267). Dr.

3   Parnell concluded that Plaintiff could lift and/or carry 20 pounds occasionally; lift 10 pounds frequently;

4   sit for up to one hour in an eight-hour day; and walk and stand for up to one hour in an eight-hour a day.

5   (Tr. 268). Plaintiff would need ten-minute breaks every hour and a half or two hours. (Tr. 21). Dr.

6   Parnell concluded that Plaintiff was unable to work full-time.

7            On January 2, 2004, Dr. Parnell wrote a status letter stating that Plaintiff was disabled due to

8   multiple medical conditions, and that without a drastic change in his condition, the disability would be

9   permanent. (Tr. 274). She also submitted a report to the California Department of Motor Vehicles

10  ("DMV") indicating that she had cautioned Southworth not to drive when he was in severe pain. (Tr.

11  21).

12           On February 3, 2004, Plaintiff again saw Dr. Parnell and reported shaking more, losing all

13  vision, and seeing stars. (Tr. 21). Dr. Parnell observed Plaintiff lying on his back with shaking hands

14  and feet. (Tr. 323). His urine test was positive for cannabinoids. Dr. Parnell instructed Plaintiff to stop

15  using marijuana, to discontinue narcotic pain medication, and not to drive when in pain. (Tr. 21).

16           In a status letter dated March 18, 2004, Dr. Parnell reported that Plaintiff's main disability was

17  diffuse, severe chronic pain. (Tr. 317). In her opinion, Plaintiff's prognosis for a full recovery was

18  poor. Dr. Parnell precluded Plaintiff from bending, lifting, walking, standing, sitting or stooping for

19  more than fifteen minutes. (Tr. 318). She also noted that Southworth appeared to be sad, had

20  diminished memory and decreased frustration levels. *Id*. Dr. Parnell opined that Plaintiff's social skills

21  were limited by his ability to converse for any length of time without shaking or jerking his arms and

22  legs, as well as by his frustration that bordered on anger or despair. *Id*. She also opined that Southworth

23  could not work and was overwhelmed by his pain and "totally entrenched in his disability." *Id*. Dr.

24  Parnell stated that Plaintiff could benefit from current neurological and psychiatric consultations, and

25  that if he were amenable to trying newer forms of psychiatric treatment, the outcome would be different.

26  *Id*.

27           On March 26, 2004, Plaintiff told Dr. Parnell that he last used marijuana two weeks ago.

28  Physical examination revealed that his arms and legs were jerking without any rhythmicity. Laboratory

1    tests were positive for cannabinoids.  (Tr. 22).

2           Plaintiff's California driver's license was suspended on March 31, 2004, for failure to submit

3    medical information.  (Tr. 22).  On April 2, 2004, Dr. Parnell filled out a Driver Medical Evaluation

4    form for the DMV, indicating that Plaintiff was not on a controlled medical regimen.  (Tr. 22).  She

5    concluded that Plaintiff's condition affected his ability to drive, and that she advised him not to drive

6    when he was in a lot of pain or light-headed.  *Id*.  Dr. Parnell also noted that the use of marijuana was

7    not compatible with pain medication.  *Id*.  She declined to prescribe further narcotics until Plaintiff was

8    drug-free for two weeks.

9           On January 9, 2003, Plaintiff was examined by Thomas Dorsey, M.D. ("Dr. Dorsey"), an

10   orthopedist.  (Tr. 184-87).  Dr. Dorsey reported that Plaintiff's chief complaint was of lower back pain,

11   with continued "myoclonic tremors" in the upper extremities.  (Tr. 184).  Orthopedic evaluation

12   revealed "voluntary alternate tapping, repetitive motions of the right hand, left hand, right arm, left arm,

13   and right and left lower extremities," with occasional snapping of his fingers.  (Tr. 185).  The tremors

14   appeared to be voluntary, because when the subjective body part was examined, all the tremors

15   disappeared.  *Id*.  Examination of the cervical and lumbar spines revealed no spasm.  Plaintiff refused

16   any lumbar ranges of motion.  *Id*.  Straight leg raising was negative bilaterally.  *Id*.  Neurological

17   examination was normal.  (Tr. 186).  Dr. Dorsey diagnosed "lumbar musculoligamentous sprain/strain,

18   resolved."  *Id*.  Dr. Dorsey assessed "no impairment-related physical limitations."  *Id*.

19          On May 1, 2004, Southworth began psychological counseling and treatment at the UCSD

20   Outpatient Psychiatric Services/Gifford Clinic.  (Tr. 370-73).  In September of 2004, he underwent an

21   extensive assessment.  Plaintiff was diagnosed with conversion disorder.[2]  Between October 29, 2004,

22   and October 5, 2004, Plaintiff was examined by Nancy Thomas, Ph.D. ("Dr. Thomas"), a psychologist,

23   and Martha A. Diaz, M.A. ("Ms. Diaz"), a psychology intern.  Dr. Thomas and Ms. Diaz observed

24   Southworth using arm braces while walking slowly to the examining room.  His arms were rested on the

25   _____

26          [2]"Such a condition is characterized by emotional distress and anxiety. The patient unconsciously
     produces physical symptoms to meet his psychological problem.... Since the physical symptoms are
27   unconsciously produced, the patient himself sees no relation between his symptoms and the stress
     situation. This lack of intent to deceive distinguishes the conversion reaction from malingering, where
28   the symptoms are consciously produced with intent to deceive."  *Crain v. Callahan*, 996 F.Supp. 1003,
     1011 (D. Or. 1997) (citing *Hassler v. Weinberger*, 502 F.2d 172, 176 n. 3 (7th Cir. 1974)).

1   braces.  The wrists continually moved in a circular radial twitching fashion.  Plaintiff reported a history

2   of depression after his work accident.  Plaintiff believed that the accident was caused purposefully by a

3   co-worker who was angry because Plaintiff had asked him to do the job.  Southworth repeatedly stated

4   that he had a "spinal cord injury" that resulted in "radial twitching and difficulty standing," as well as

5   perpetual pain.  Despite an extensive neurological work-up, no spinal injury was found to corroborate

6   the complaints of pain and other symptoms.  (Tr. 370).

7          Plaintiff denied that he had received feedback from September assessment.  He "seem[ed] to lack

8   any awareness that his physical symptoms have no physical cause.  In fact, he was hesitant to take

9   psychotropic medications for his repression because he felt that there was nothing wrong with his

10   'mind.'"  (Tr. 370-71).  When questioned about the lack of evidence to support his physical symptoms,

11   Southworth claimed that there was "a cover-up to keep him from getting disability or benefits for his

12   injury."  (Tr. 370).  Dr. Thomas and Ms. Diaz noted Southworth's four and a half years' history of

13   depression, dating back to his accident.  Southworth reported that "[e]motionally" he was "not handling

14   things very well."  *Id.*  Plaintiff described decreased motivation, a sense of haplessness, excessive sleep

15   and eating, decreased pleasure, and "no motivation to live."  *Id.*  He felt unable to work due to his

16   physical injuries.  He stated that his "emotional well-being was very much tied to [his] physical body."

17   *Id.*  He felt he did not have much to live for and could not see himself living out his life this way.  The

18   mental status examination revealed difficulty expressing himself with a consequent difficulty obtaining

19   information; difficulty describing emotional states or feelings; a limited but mostly depressed affect; and

20   a poor understanding of the course of his illness and how it affected him.  (Tr. 371-72).  He spent most

21   of his time at home, watching TV and sleeping.  If Plaintiff "exerted himself," such as by walking down

22   the street or doing chores, he felt "terrible and [would] have to pay the price by being confined to bed

23   rest."  (Tr. 372).  He was unable to complete even basic tasks because of extreme physical pain.

24   Plaintiff had problems with concentration and task completion, and took "an excessive amount of time

25   to fill out questionnaires."  (Tr. 372).  Plaintiff admitted to using marijuana occasionally.

26          Dr. Thomas found that Plaintiff "appear[ed] unable to tolerate the demands common to a work

27   environment."  (Tr. 372).  He took 20 mg of Prozac daily, as prescribed by psychiatrists at the Gifford

28   Clinic.  *Id.*  Dr. Thomas diagnosed a major depressive disorder, moderate; conversion disorder; and

1   narcissistic personality disorder.  Plaintiff's GAF was assessed at 31.  Dr. Thomas opined that Plaintiff's

2   "mood symptoms impair his ability to support himself;" that he "lack[ed] judgment and insight, further

3   hampering his ability to gain employment;" and that his psychiatric care "requir[ed] frequent

4   appointments, which [would] impair his ability to maintain full-time work."  (Tr. 372-73).

5        On September 16, 2004, Plaintiff was examined by Matthew Carroll, M.D. ("Dr. Carroll"), a

6   psychiatrist.  (Tr. 362-68).  Plaintiff was using crutches and appeared to be in pain.  (Tr. 363).

7   Plaintiff's social interaction, psychomotor activity and speech were normal.  *Id*.  Dr. Carroll found that

8   Plaintiff's mood was dysphoric, but the mental status examination was otherwise normal.  *Id*.  Plaintiff

9   was able to recall seven digits forward and three digits backwards.  Plaintiff was not easily distracted

10  and his thought processes were organized.  *Id*.  He did not know what to do if the office were on fire.  *Id*.

11

12       Dr. Carroll diagnosed Southworth with a depressive disorder due to a general medical condition,

13  with a GAF of 65.  (Tr. 364).  Dr. Carroll found "moderate" limitations on Plaintiff's ability to interact

14  with others socially at an age-appropriate level, and "slight" limitations on his ability to complete

15  detailed or complex tasks and to concentrate for at least two-hour increments.  (*Id*.  Dr. Carroll found no

16  limitations on Plaintiff's ability to understand instructions, as demonstrated during the evaluation; to

17  maintain an ordinary routine without sustained supervision; and to complete simple tasks.  *Id*.

18       On September 21, 2005, Southworth underwent a neurological consultation with Michael

19  Sukoff, M.D. ("Dr. Sukoff").  (Tr. 404-07).  Plaintiff complained of lower back and neck pain with

20  lower leg "burning."  (Tr. 404).  Neurological examination revealed difficulty walking without crutches;

21  an occasional, rapid elevation of his right arm; frequent tremors of the head; frequent right leg tremor

22  that can be controlled with the left leg; hyperhidrosis of the upper part of the body; severe spasm in the

23  left side of the neck with ranges of motion limited by "severe symptoms;" a hyperactive lower extremity

24  reflexes; and bilateral Babinski signs.  (Tr. 406).  Dr. Sukoff also reviewed a cervical MRI taken in

25  August of 2003 and indicating disc osteophytes at C6-7 and C7-T1, with significant thecal compression.

26  (Tr. 407).  He diagnosed dystonic disorder, suggesting "chronic and current spinal cord injury," as

27  supported by his finding of pathological reflexes, observance of Plaintiff's spastic movements of

28  hyperhidrosis, and CT of the cervical spine performed in 2003.  *Id*.

06cv0699

1   Dr. Sukoff found that Plaintiff's condition would last for over twelve months.  Dr. Sukoff did not

2   believe that Plaintiff could perform full-time "imputative work."  (Tr. 407).

3       **B.      The Administrative Hearing**

4       The administrative hearing was originally held on August 19, 2004.  The vocational expert called

5   to testify was excluded due to a conflict of interest.  The expert had previously served as a vocational

6   rehabilitation counselor to Plaintiff.  (Tr. 446-47, 451).  The hearing was continued to December 9,

7   2004.  (Tr. 449-58).

8       At the December 9, 2004 administrative hearing, the testifying medical expert ("ME") was Arvin

9   Klein ("Dr. Klein"), an internist.  (Tr. 430-40).  Dr. Klein had reviewed Plaintiff's record history.  Dr.

10  Klein testified that based on the record, Plaintiff's tremors were not credible.  (Tr. 432).  There was

11  evidence of legally "severe," medically determinable impairments of cervical and lumbar arthritis,

12  including a mild disc bulge and mild impingement; a stomatoform disorder; and substance addiction.

13  (Tr. 432-33).  Based on a recent review of Southworth's MRI taken in August of 2003, Dr. Klein

14  assessed him with "a light to medium capability with a 10- to 30-pound lifting ability, with occasional

15  bending, stooping, crouching and crawling."  (Tr. 433, 436-37).  Dr. Klein deferred to the opinion of Dr.

16  Dorsey on the issue of nerve root impingement.  According to Dr. Klein, his opinion was based on the

17  records, "and the records by an orthopedist are certainly pretty credible."  (Tr. 437).  Dr. Klein

18  acknowledged, however, that Dr. Dorsey made his findings in January of 2003, and therefore did not

19  have a chance to review the MRI taken in August of 2003.  *Id.*

20      Dr. Klein also opined that Dr. Lasker's finding of total disability was inconsistent with his other

21  findings.  (Tr. 438).  Dr. Klein agreed that Plaintiff could not do any heavy work.  *Id.*  Dr. Klein,

22  however, gave little weight to Dr. Lasker's February 21, 2001 evaluation, relying instead on Dr.

23  Dorsey's opinion.  (Tr. 440).

24       John Kilcher ("Kilcher") testified as the vocational expert ("VE").  The VE stated that

25  Plaintiff's previous work as a plumber was heavy skilled work.  (Tr. 452).  The skills would not be

26  transferable to medium, light or sedentary positions.  (Tr. 452-53).  The ALJ asked the VE a number of

27  hypothetical questions.  The ALJ asked what jobs could be performed by an individual limited to light

28  work, with no more than simple, repetitive tasks.  The VE responded that such an individual could work

as an assembler and production inspector.  (Tr. 453).  The ALJ then asked another hypothetical question based on Dr. Lasker's assessment of an individual who could perform no lifting of over ten pounds, no repetitive bending, stooping or activities with flexion or extension of the back.  The VE testified that a person with those limitations could perform the sedentary work of a final assembler.  (Tr. 453-54).  Adding a limitation to simple and repetitive tasks would allow for the job of a production worker.  (Tr. 454).  With regard to a third hypothetical, based on Dr. Parnell's assessments, including the ability to sit and stand/walk for no more than one hour, the VE stated that there would be no jobs available.  (Tr. 266-73, 454).  The need to miss more than three days a month due to pain and dizziness, as suggested by Dr. Parnell, would eliminate all jobs.  (Tr. 455).  Pain sufficient to affect his concentration and attention "frequently" would also eliminate all jobs.  *Id.*  The use of crutches for walking and sitting down, however, would eliminate light jobs, but not sedentary jobs.  (Tr. 456).

C.      **The ALJ's Findings**

The Social Security regulations set forth a five-step sequential evaluation process for determining whether a claimant has established her eligibility for benefits.  *See* 20 C.F.R. § 404.1520.  First, the ALJ must determine whether the claimant is engaged in substantial gainful activity.  *See* 20 C.F.R. § 404.1520(b).  If not, the ALJ then must determine whether the claimant's impairments are "severe" within the meaning of the regulations.  *See* 20 C.F.R. § 404.1520(c).  If the impairments are "severe," then the ALJ must compare the claimant's impairments to the impairments listed in the "Listing of Impairments" set forth in Appendix 1 to 20 C.F.R. § 404.  *See* 20 C.F.R. § 404.1520(d).  If any "severe" impairment equals a listed impairment, the claimant must be found to be disabled.  However, if a "severe" impairment does not equal a listed impairment, the ALJ must determine the claimant's residual functional capacity.  If the claimant retains the capacity to perform his or her past relevant work, the claimant is not disabled.  *See* 20 C.F.R. § 404.1520(f).  If the ALJ determines that the claimant can no longer perform past relevant work, the ALJ must consider whether the claimant can perform other work in the national economy.  *See* 20 C.F.R. § 404.1520(g).  If the claimant can perform other work in the national economy, then the claimant may not be found to be disabled.  *Id.*; *see also Batson v. Commissioner of Social Security Administration,* 359 F.3d 1190, 1193-94 (9th Cir. 2004).

In his written decision, the ALJ found as follows.  Plaintiff's degenerative disc disease of the

06cv0699

1  lumbar spine, degenerative disc disease of the cervical spine, and mood disorder are considered

2  "severe." (Tr. 28). These medically determinable impairments did not meet or equal one of the listed

3  impairments. The allegations regarding Plaintiff's limitations were not totally credible. Plaintiff

4  retained the residual functional capacity to perform light work. His mental impairments caused a

5  moderate restriction on his ability to work with the public. (Tr. 28). Plaintiff was not able to perform

6  any of his past relevant work as a plumber. Plaintiff had no transferable skills, but the transferability of

7  skills was not an issue. Plaintiff was capable of performing the light and unskilled work of an assembler

8  or inspector. (Tr. 28). Plaintiff was therefore not under a disability.

9  ### III. LEGAL STANDARD

10     The Commissioner's decision must be affirmed if supported by "substantial evidence," and if the

11  Commissioner applied the correct legal standards. *Batson*, 359 F.3d at 1193; *Connett v. Barnhart*, 340

12  F.3d 871, 873 (9th Cir. 2003). "Substantial evidence" is "more than a mere scintilla but not necessarily

13  a preponderance." *Connett*, 340 F.3d at 873. Under this standard, the Commissioner's findings are

14  upheld if supported by inferences reasonably drawn from the record. *See Gallant v. Heckler,* 753 F.2d

15  1450, 1452-53 (9th Cir. 1984). If evidence exists to support more than one rational interpretation, the

16  Court must defer to the Commissioner's decision. *See Morgan v. Commissioner of Social Sec. Admin.*,

17  169 F.3d 595, 599 (9th Cir. 1999).

18  ### IV. DISCUSSION

19     In his motion for summary judgment, Plaintiff only disputes the findings regarding his mental

20  impairments. Plaintiff argues that (1) the ALJ failed to credit the diagnoses of conversion disorder and

21  major depression, finding Plaintiff's only mental impairment to be a mood disorder; (2) the ALJ

22  improperly found that the only limitation from Plaintiff's mental impairment was a moderate limitation

23  on the ability to work with the public; and (3) the ALJ failed to include the moderate limitation on

24  Plaintiff's ability to interact with public in the hypothetical question posed to the VE. Defendant moves

25  for summary judgment on the same three issues. The Court will address each issue in turn.

26  **A.    Plaintiff's Mental Impairments**

27     The ALJ properly found that Plaintiff's only severe mental impairment was the mood disorder.

28  Plaintiff argues that his mental condition, "in conjunction with the physical limitations imposed by his

1   neck and low back impairments," is the principal source of his disability.  (Pl.'s P. & A. in Sup. of Mot.

2   for Summ. J., 14:20-21).

3        An impairment is considered severe when it significantly limits the claimant's physical or mental

4   ability to perform basic work activities.  *See* 20 C.F.R. §§ 404.1520(c); 404.1521(a); 416.920(c).  Basic

5   work activities are "abilities and aptitudes necessary to do most jobs," including walking, standing,

6   sitting, lifting, pushing, pulling, reaching, carrying or handling; use of judgment; responding

7   appropriately to supervision, co-workers and usual work situations; and dealing with changes in a

8   routine work setting. 20 C.F.R. § 140.1521(b); 416.921(b); Social Security Ruling ("SSR") 85-28.  A

9   finding of "not disabled" is made when the medical evidence establishes only a slight abnormality

10  which would have no more than a minimal effect on an individual's ability to work.  SSR 85-28.

11       The ALJ gave due consideration to the medical evidence and properly concluded that Plaintiff's

12  other alleged mental impairments did not significantly limit his physical or mental ability to perform

13  basic work activities.  Plaintiff's diagnoses included a mood disorder; major depressive disorder,

14  moderate; conversion disorder; and narcissistic personality disorder.  Plaintiff's mental status was

15  examined by three different physicians, Dr. Soliman, a neurologist and psychiatrist; Dr. Carroll, a

16  psychiatrist; and Dr. Thomas, a psychologist.  (Tr. 179-82; 362-68; 370-73).

17       Plaintiff was examined by Dr. Soliman on December 27, 2002.  The psychiatrist noted that

18  Plaintiff reported being depressed, but that Plaintiff also admitted being able to cook, clean, shop, and

19  do errands.  (Tr. 180-81).  Plaintiff stated that he got along well with his family, friends and neighbors.

20  Dr. Soliman found that although Plaintiff displayed a depressed mood and affect, his mental status

21  examination was normal.  (Tr. 180-81).  Dr. Soliman diagnosed a mood disorder with a GAF of 68.  As

22  noted above, a GAF score of 61 indicates a person who is "generally functioning pretty well."

23  American Psychiatric Ass'n, *Diagnostic & Statistical Manual of Mental Disorders*, p. 32.  Dr. Soliman

24  also found that Plaintiff could understand, carry out, and remember simple and complex instructions;

25  interact with co-workers, supervisors, and the general public; and was able to withstand the stress and

26  pressures associated with an eight-hour workday and day-to-day activities.  (Tr. 182).

27       Dr. Carroll saw Plaintiff on September 16, 2004.  (Tr. 362-68).  Dr. Carroll reported that

28  Plaintiff's social interaction, psychomotor activity and speech were normal.  (Tr. 363).  Plaintiff's mood

06cv0699

1   was dysphoric, but the mental status examination was otherwise normal.  *Id*.  Although Plaintiff could

2   not tell what to do if the office were on fire, he was not easily distracted, and his thought processes were

3   organized.  *Id*.  Dr. Carroll diagnosed Southworth with a depressive disorder due to a general medical

4   condition, with a GAF of 65.  (Tr. 364).  Dr. Carroll found "moderate" limitations on Plaintiff's ability

5   to interact with others socially at an age-appropriate level, and "slight" limitations on his ability to

6   complete detailed or complex tasks and to concentrate for at least two-hour increments.  *Id*.  No

7   limitations were found on Plaintiff's ability to understand instructions, as demonstrated during the

8   evaluation; to maintain an ordinary routine without sustained supervision; or to complete simple tasks.

9   *Id*.

10          Finally, between October 29, 2004, and October 5, 2004, Plaintiff was examined by Dr. Thomas.

11   (Tr. 370-73).  Dr. Thomas noted Southworth's "history of depression."  (Tr. 370).  Plaintiff described

12   decreased motivation, a sense of hopelessness, excessive sleep and eating, decreased pleasure, and "no

13   motivation to live."  *Id*.  The mental status examination revealed difficulty expressing himself with a

14   consequent difficulty obtaining information; difficulty describing emotional states or feelings; a limited

15   but mostly depressed affect; and a poor understanding of the course of his illness and how it affected

16   him.  (Tr. 371-72).  Plaintiff had problems with concentration and task completion.  (Tr. 372).  Plaintiff

17   admitted to using marijuana occasionally.

18          Dr. Thomas found that Plaintiff "appear[ed] unable to tolerate the demands common to a work

19   environment."  (Tr. 372).  He took 20 mg of Prozac daily, as prescribed by psychiatrists at the Gifford

20   Clinic.  *Id*.  Dr. Thomas diagnosed a major depressive disorder, moderate; conversion disorder; and

21   narcissistic personality disorder.  Plaintiff's GAF was assessed at 31.  Dr. Thomas opined that Plaintiff's

22   "mood symptoms impair[ed] his ability to support himself;" that he "lack[ed] judgment and insight,

23   further hampering his ability to gain employment;" and that his psychiatric care "requir[ed] frequent

24   appointments, which [would] impair his ability to maintain full-time work."  (Tr. 372-73).

25          The ALJ found that Plaintiff's only severe mental impairment was his mood discover.  (Tr. 28).

26   Plaintiff argues the ALJ failed to credit, reject or assign any particular weight to Dr. Thomas's opinion

27   and simply overlooked it.  If adopted, the opinion would lead to a finding of complete disability.

28          The ALJ properly gave more weight to the findings of Dr. Soliman and Dr. Carroll and less

14

06cv0699

weight to the findings of Dr. Thomas. "When there is conflicting medical evidence, the Secretary must determine credibility and resolve the conflict." *Matney v. Sullivan,* 981 F.2d 1016, 1019 (9th Cir. 1992); *see also Todd Pac. Shipyards Corp. v. Dir., OWCP,* 913 F.2d 1426, 1432 (9th Cir. 1990) ("Credibility determinations, of course, are within the ALJ's province, and we must give them great weight."). The ALJ may disregard the treating or examining physician's opinion, whether or not that opinion is contradicted. *See Magallanes v. Bowen,* 881 F.2d 747, 751 (9th Cir. 1989). In the event of a conflict between the opinions of a treating physician and an examining physician, the treating physician's opinion may be disregarded by the ALJ only for "specific and legitimate reasons supported by substantial evidence in the record." *Lester v. Chater,* 81 F.3d 821, 830 (9th Cir. 1995).

Further, "[s]tate agency medical and psychological consultants and other program physicians and psychologists are highly qualified physicians and psychologists who are also experts in Social Security disability evaluation." 20 C.F.R. § 404.1527(f). Drs. Soliman and Carroll were state agency physicians.

The ALJ summarized Dr. Thomas's findings in his written decision. (Tr. 22-23). Dr. Thomas's findings were contradicted by the findings of Drs. Carroll and Soliman. Contrary to Plaintiff's argument, there are specific and legitimate reasons in the record to support the ALJ's discounting of Dr. Thomas opinion. The ALJ is not required to "recite the magic words, "I reject [the doctor's] opinion [] because...."" *Magallanes*, 881 F.2d at 755.

> [O]ur cases do not require such an incantation. As a reviewing court, we are not deprived of our faculties for drawing specific and legitimate inferences from the ALJ's opinion. It is proper for us to read the paragraph discussing [treating physician's] findings and opinion, and draw inferences relevant to [another treating physician's] findings and opinion, if those inferences are there to be drawn.

*Id.* The ALJ stated that "in contrast to the claimant's claim of total disability," Southworth admitted to Dr. Soliman that he can cook, clean, do errands and go shopping. (Tr. 26). Dr. Carroll and Dr. Soliman found no severe psychiatric impairment. Dr. Carroll found only a moderate limitation on Plaintiff's ability to work with the public. Dr. Soliman concluded that Plaintiff could perform simple repetitive tasks and complex tasks. Plaintiff declined psychiatric medications that could "quite possibly change the outcome of his situation." Because the state agency physicians found no significant limitations on Plaintiff's physical or mental abilities to perform basic work activities, the ALJ properly found that Plaintiff's mood disorder was the only severe mental impairment.

06cv0699

**B.      Limitations on Plaintiff's Ability to Work with the Public**

The ALJ properly found that the only restriction resulting from Plaintiff's mental impairments was a moderately limited ability to work with the public. (Tr. 24). As stated above, the ALJ properly found that Plaintiff's only severe mental impairment was his mood disorder. Dr. Soliman found no functional limitations. Dr. Carroll found "moderate" limitations on Plaintiff's ability to interact with others socially at an age-appropriate level, and "slight" limitations on his ability to complete detailed or complex tasks and to concentrate for at least two-hour increments. (Tr. 364). Dr. Carroll found no limitations on Plaintiff's ability to understand instructions, as demonstrated during the evaluation; to maintain an ordinary routine without sustained supervision; and to complete simple tasks. (Tr. 364). The ALJ also considered Dr. Parnell's opinion that Plaintiff's social skills were limited by his ability to converse for any length of time without shaking or jerking his arms and legs. (Tr. 22, 218). The ALJ's decision concluded that Plaintiff's mental impairment caused "a moderate restriction of [Plaintiff's] ability to work with the public." (Tr. 24).

Southworth argues that the limitation on the ability to interact with others at an age-appropriate level is much broader than the limitation on the ability to work with the public; and that the ALJ disregarded the other, "slight," limitations found by Dr. Carroll. Even if interaction with "others" is a broader category than interaction with the "public," there is substantial evidence in the record to support the ALJ's finding. Although Dr. Carroll phrased this limitation in terms of interaction "with others," he also found no limitations on Plaintiff's ability to understand instructions, as demonstrated during the evaluation; to maintain an ordinary routine without sustained supervision; and to complete simple tasks. (Tr. 364). The record therefore supports a conclusion that Plaintiff could adequately interact with his superiors or co-workers. Other limitations found by Dr. Carroll were slight. Further, Dr. Soliman assessed no limitations regarding Plaintiff's ability to work with the public, co-workers or any other individuals. Therefore there is enough evidence to support a conclusion that Plaintiff's functional limitation applied to his ability to work with the public.

Further, Plaintiff does not explain how the "slight" restrictions on his ability to complete detailed or complex tasks and to concentrate for at least two-hour increments alter the ALJ's findings of no disability. As noted above, Dr. Soliman found no limitations in these areas. Therefore the record

06cv0699

1   supports a finding of no restrictions on Plaintiff's ability to complete detailed or complex tasks and to

2   concentrate for at least two-hour increments.

3

4         **C.      VE's Testimony**

5         Although the ALJ did not include the moderate restriction on Plaintiff's ability to work with the

6   public in the hypothetical question posed to the VE, the ALJ's finding regarding jobs available to

7   Plaintiff is supported by substantial evidence.  "[A] hypothetical question should 'set out all of the

8   claimant's impairments.  If the assumptions in the hypothetical are not supported by the record, the

9   opinion of the vocational expert that claimant has a residual working capacity has no evidentiary value."

10

11  *Gallant v. Heckler,* 753 F.2d 1450, 1456 (9th Cir. 1984).

12        As stated above, the ALJ found that Plaintiff is moderately restricted in his ability to work with

13  the public.  When questioning the VE about the jobs available to Plaintiff, the ALJ specified that the

14  jobs should be light work with simple, repetitive tasks.  (Tr. 453).  The restriction on the ability to work

15  with the public was not included in the hypothetical.  The VE testified that with the proposed

16  limitations, Plaintiff would be able to work as an assembler or production inspector.  Both positions

17  involve light work and do not require skills.

18        The ALJ did not err in relying on the VE"s testimony regarding jobs available to Plaintiff.  The

19  Dictionary of Occupational Titles lists a number of job descriptions for an assembler and inspector.  The

20  job descriptions for different types of assemblers essentially require positioning of the parts of an object.

21  *See, e.g.,* Dictionary of Occupational Titles, 4th Ed. (1991), pp. 692, 712.  The job descriptions for an

22  inspector require examination of an object to ensure its compliance with the appropriate specifications.

23  *See id.,* pp. 692, 712-13.  Neither type of work appears to require interaction with the public.  Therefore

24  although the restriction of Plaintiff's ability to work with the public was not part of the hypothetical

25  question, the VE's testimony is not deprived of its evidentiary value.  Substantial evidence in the record

26  supports the ALJ's finding that Plaintiff could perform the work of an assembler or an inspector.

27                              **V.  CONCLUSION**

28        Based on the above, the ALJ's decision was supported by substantial evidence and free of legal

06cv0699

1    error.  Accordingly, Plaintiff's motion for summary judgment is **DENIED,** and Defendant's motion for

2    ////

3    ////

4    ////

5    summary judgment is **GRANTED.**

6        **IT IS SO ORDERED.**

9    DATED:  September 7, 2007

                                      Hon. Roger T. Benitez
                                      United States District Judge

06cv0699